Lance SCOTT, Appellant–Respondent,

v.

BLUE SPRINGS FORD SALES, INC., Respondent–Appellant,

Robert C. Balderston, Respondent.

No. WD 64428.

Missouri Court of Appeals, Western District.

Nov. 21, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 2007.

Application for Transfer Denied March 20, 2007.

---

Bernard E. Brown, Fairway, KS, for Appellant–Respondent.

Kevin D. Case and David J. Roberts, Kansas City, MO, for Respondent–Appellant.

James R. Hobbs and Marilyn B. Keller, Kansas City, MO, for Respondent.

Before: EDWIN H. SMITH, C.J., and NEWTON and HOLLIGER, JJ.

EDWIN H. SMITH, Chief Judge.

Lance Scott (Scott) filed suit in the Circuit Court of Jackson County against Blue Springs Ford Sales, Inc. (BSF), and Robert Balderston (Balderston), seeking damages, injunctive relief, and attorney's fees, regarding the sale to him by BSF of a 1991 Ford Explorer (the Explorer) in March of 1994, which, unbeknownst to him, had been wrecked and on which a salvage title had been issued. Balderston was the president and sole shareholder of BSF.

In his amended petition of April 17, 2001, Scott alleged sixteen counts, Counts I–VIII against BSF and Counts IX–XVI against Balderston. At trial, only Counts I–IV and VIII, against BSF, and Counts IX–XII, against Balderston, were submit-

ted to the jury. The other counts were abandoned. As to BSF, in Count I, Scott sought both compensatory and punitive damages for common law fraud for fraudulent misrepresentation as to the Explorer being wrecked and a salvage title being issued; in Count II, he sought both compensatory and punitive damages, injunctive relief, and attorney's fees, pursuant to § 407.025.1[1] of the Missouri Merchandising Practices Act (MMPA), for violation of § 407.020 of the MMPA with respect to the undisclosed condition of the Explorer at the time of sale; in Count III, he sought both compensatory and punitive damages for conversion by BSF of the payment Scott made on a service contract for the Explorer; in Count IV, he sought both compensatory and punitive damages for negligent misrepresentation as to the undisclosed condition of the Explorer at the time of sale; and in Count VIII, he sought both compensatory and punitive damages for breach of express and implied warranties of §§ 400.2–313 and 400.2–314(2)(a), respectively, and attorney's fees, pursuant to the Magnuson–Moss Warranty Act (MMWA), Title 15 U.S.C. § 2310(d). As to Balderston, in Count IX, Scott sought both compensatory and punitive damages for Balderston allegedly conspiring with BSF to defraud him as to the condition of the Explorer at the time of sale; in Count X, he sought both compensatory and punitive damages, injunctive relief, and attorney's fees, pursuant to § 407.025.1 of the MMPA, for Balderston allegedly conspiring with BSF to violate § 407.020 as to the condition of the Explorer at the time of sale; in Count XI, he sought both compensatory and punitive damages for Balderston allegedly conspiring with BSF to wrongfully convert Scott's payment for the service contract on the Explorer; and in Count XII, he sought both compensatory

and punitive damages for Balderston allegedly conspiring with BSF to negligently misrepresent the condition of the Explorer at the time of sale.

The issue of punitive damages as to Counts II and X, the MMPA counts against BSF and Balderston, and Count VIII, the breach of warranty count against BSF, was not submitted to the jury. As to Counts II and X, the trial court, interpreting § 407.025.1, concluded that such damages were for the assessment by the court alone. By agreement of the parties, assessment of compensatory damages for conversion, Counts III and XI, was also reserved for the trial court. And, as a matter of law, Scott's request for injunctive relief, as to Counts II and X, and his request for attorney's fees as to those counts, and Count VIII, the breach of warranty claim against BSF, were reserved for determination by the trial court.

The jury returned verdicts for Scott and against BSF on Counts I–III and VIII, and for BSF and against Scott on Count IV, the negligent misrepresentation count. As to Scott's claims against Balderston, the jury returned verdicts for Balderston and against Scott on all four counts submitted, Counts IX–XII. As to Counts I, II, and VIII, the jury assessed compensatory damages of $25,500. As to Count III, conversion, the trial court assessed compensatory damages of $2,099.82. As to the issue of punitive damages submitted to the jury, it assessed punitive damages of $840,000. As to punitive damages on Count II, the MMPA claim against BSF, the trial court found in favor of BSF "upon [Scott's] refusal to make an election of remedies between common law fraud and action under the Missouri Merchandising Practices Act," because it believed that an

---

**1.** All statutory references are to RSMo, 2000, unless otherwise indicated.

election of remedies issue was presented, rather than a merger of judgments issue.

BSF appealed the trial court's judgment for Scott to this court. Thereafter, Scott filed an appeal in the Missouri Supreme Court. Upon the parties' motions to transfer, BSF's appeal was transferred to the Supreme Court and consolidated with Scott's appeal, with Scott being designated the "appellant" and BSF being designated the "cross-appellant."

In his appeal to the Supreme Court, Scott raised four claims of error. In Point I of his appeal, Scott claimed that the trial court erred in refusing to submit the issue of punitive damages to the jury on Count II of his amended petition against BSF, his MMPA claim, because the trial court's application of § 407.025.1, that the assessment of punitive damages was expressly reserved to the trial court, violated article I, section 22(A) of the Missouri Constitution. The Court found for Scott on this claim. *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 143 (Mo. *banc* 2005). Thereafter, the Supreme Court transferred the case to this court to resolve all remaining issues as to Scott's appeal and BSF's cross-appeal. *Id.*

As to his remaining claims of error, in Point II, Scott claims that the trial court erred in refusing to grant him injunctive relief, enjoining BSF from making similar misrepresentations to future buyers, as to his MMPA claim, Count II, because having "established BSF's multiple and continuing violations of § 407.020 causing him loss and threatening public safety," § 407.025.1 expressly authorized and mandated such relief. In Point III, as to his claims against Balderston, he claims that the trial court erred in excluding evidence of similar sales of wrecked vehicles by BSF between 2000 and 2002 and evidence of a verdict and settlement in two other cases involving the sale of wrecked vehicles by BSF and Blue Springs Wholesale Outlet (Wholesale), because it was relevant to show Balderston's intent to conspire with BSF to sell rebuilt wrecked vehicles, like Scott's Ford Explorer, during the relevant time frame, and to rebut Balderston's defense at trial that while "there may have been some problems with wrecked cars sold in the 1990s, [when] he and BSF had learned about them[, they] had taken multiple steps to correct those problems." In Point IV, he claims that the trial court erred in denying his request for attorney's fees as to his MMPA claim, Count II, and his MMWA claim, Count VIII, as expressly provided in § 407.025.1 of the MMPA and 15 U.S.C. § 2310(d)(1) of the MMWA, because in doing so, it misapplied the law by taking into consideration the amount of the awards of compensatory and punitive damages made to Scott.

In its cross-appeal, BSF raises five points. In Point I, it claims that the trial court erred in admitting, over its objection, evidence of alleged similar occurrences of sales of wrecked vehicles to show, *inter alia*, a fraudulent intent in the sale of the Explorer to Scott, because it was not admissible against BSF, in that the sales were conducted by separate legal entities, Blue Springs Nissan (BSN) and Wholesale, not BSF. In Point II, it claims that the trial court erred in allowing, over its objection, Scott's expert testimony regarding safety issues concerning the Explorer, because the mandates of § 490.065, governing the admission of expert testimony, were not satisfied. In Point III, it claims that the trial court erred in overruling its motion for a new trial based on an award of excessive compensatory damages, as to Counts I, II, and VIII, or, in the alternative, denying its request to remit the award as being excessive, pursuant to § 537.068, because the award was not supported by the record, but was engendered

by the bias, passion and prejudice of the jury, caused by the trial court's admission of evidence of alleged similar occurrences of sales of wrecked vehicles by BSN and Wholesale. In Point IV, it claims that the trial court erred in overruling its motion for a new trial based on an award of excessive punitive damages, as to Count I, or, in the alternative, denying its request to remit the award as being excessive, pursuant to § 510.263, because the award was so excessive that it had to have been engendered solely by the bias, passion and prejudice of the jury caused by the trial court's admission of evidence of alleged similar occurrences of sales of wrecked vehicles by BSN and Wholesale. In Point V, it claims that the trial court erred in overruling its motion for directed verdict at the close of the evidence and its motion for judgment notwithstanding the verdict (JNOV), with respect to Scott's breach of warranty claim, Count VIII, because Scott failed to carry his burden of showing that BSF, after being given a reasonable opportunity to do so, failed to cure the alleged defect.

As to Scott's appeal, the judgment of the Circuit Court of Jackson County is affirmed, except with respect to Point I, which was decided by the Missouri Supreme Court in *Scott*, 176 S.W.3d at 143. As to BSF's cross-appeal, the circuit court's judgment is affirmed except as to its award of compensatory damages of $25,500, and its award of punitive damages, on Count I, of $840,000. With respect to the court's award of compensatory damages, if within fifteen days of the filing of our mandate in this case, Scott enters a remittitur of $1,133, for a total compensatory damage award of $24,367, then the court's judgment as to compensatory damages will be affirmed in that amount; if not, the judgment will be reversed as to that issue, and the case remanded for a new trial on this issue of damages alone.

With respect to the court's award of punitive damages of $840,000 on Count I, Scott's breach of warranty claim under the MMWA, because the issue of punitive damages as to Count II, Scott's misrepresentation claim under the MMPA, was remanded with directives by the Missouri Supreme Court in *Scott*, and the two issues are inextricably intertwined, due to the merger doctrine and the Court's directives on remand, we decline presently the review of the issue of whether the punitive damage award of $840,000 on Count I was excessive, pending the outcome on remand of the punitive damage issue as to Count II.

## Facts

BSF is a franchise Ford dealership located in Blue Springs, Missouri. In March of 1994, Balderston was the president and sole shareholder of BSF. He also had ownership interest in other dealerships, including BSN and Wholesale, which were also located in Blue Springs, Missouri.

On March 7, 1994, Scott, then 23 years old, went to BSF to purchase a used vehicle. He was particularly interested in a 1991 Ford Explorer, which he had seen while driving on I–70. When he arrived at the dealership, Harvey Alexander, a BSF salesperson, met him and showed him the Explorer. Alexander told Scott that the Explorer was owned by an older couple and that, to the best of his knowledge, it had never been wrecked. He also told him that he would verify whether that was true.

BSF allowed Scott to take the Explorer home overnight. When he returned the next day, he again spoke to Alexander, who told him that he had investigated and found that the Explorer had not been wrecked. Based on Alexander's representation, Scott purchased the Explorer for

$14,995. The purchase price was financed, which cost Scott an additional $7,199 in interest. Scott also purchased an extended service plan (ESP) for $1,475, credit life insurance for $1,633, and paid an origination fee of $35.

On March 12, 1994, Marnette Grace (Grace), a BSF warranty administrator, attempted to register Scott's ESP with Ford Motor Company, but the registration was rejected because a salvage title had been issued on it. Grace notified Tony Vargas, the BSF service manager, about the problem. However, BSF never contacted Scott to tell him that his ESP was not registered or that his vehicle had been previously wrecked.

On August 12, 1994, Scott returned to BSF to have a transmission leak repaired. The transmission was repaired at no cost to Scott, leading him to believe that his ESP covered the repair, when in actuality it did not. On that same date, Grace tried again to register Scott's ESP, but again it was rejected because of the salvage title. Grace then ran a Carfax report, which indicated that a salvage title had been issued on the Explorer in Georgia. However, Scott was never notified of this fact, either.

Sometime in 1999, Scott took the Explorer to a mechanic in Overland Park, Kansas, to have the windshield repaired because it was cracked. After the repairs had been performed, Scott was asked whether his Explorer had ever been wrecked. He said, "No." However, the mechanic who did the repair showed him that there was rust in the channel running from the back of the hood up to the top of the vehicle and that there were welds in the channel. The technician explained that these were associated with a vehicle that had been wrecked. Based on his observations, the technician refused to is-sue a warranty for the windshield repairs he performed.

Later in 1999, a mechanic, after performing a Motor Vehicle Inspection, asked Scott whether his Explorer had ever been wrecked, and he said, "No." The mechanic then showed him where the bumper was offset and welds were breaking apart, which he explained were obvious signs that the Explorer had been wrecked and repaired.

In October of 1999, Scott took the Explorer to Matt Ford to look at his transmission. Matt Ford wanted $2,000 to replace it. Rather than replace the transmission, Scott discussed purchasing another vehicle. As part of the discussion, Matt Ford did a Carfax search and discovered that the Explorer had been issued a salvage title from Georgia. Scott immediately stopped driving the Explorer.

On February 3, 2000, Scott went to BSF and spoke with Paul Howe (Howe), the pre-owned vehicle manager of BSF, and told him that he had been advised that the Explorer had been wrecked and had a salvage title. Howe told Scott to return on February 4, 2000, to talk to Billy Harvey (Harvey), another manager, which he did. Harvey offered to buy back the vehicle for its fair market value. Scott declined the offer. On May 11, 2000, Balderston sent Scott a letter offering to buy back the Explorer for $25,400 or, if he no longer had the vehicle, to simply pay him the $25,400.

On January 2, 2001, Scott filed a two-count petition in the Circuit Court of Jackson County against BSF and Balderston. On April 7, 2001, Scott filed his first amended petition. Scott's case was tried to a jury in January of 2003. That trial ended in a mistrial. The case was retried to a jury on August 26, 2003.

The jury returned verdicts for Scott and against BSF on Counts I–III and VIII, and for BSF and against Scott on Count IV, the negligent misrepresentation count. As to Scott's claims against Balderston, the jury returned verdicts for Balderston and against Scott on all four counts submitted, Counts IX–XII. As to Counts I, II, and VIII, the jury assessed compensatory damages of $25,500. As to Count III, conversion, the trial court assessed compensatory damages of $2,099.82. As to the issue of punitive damages on Count I, the jury assessed punitive damages in the amount of $840,000.

Balderston, on November 18, 2003, and Scott, on November 21, 2003, filed motions for attorney's fees, pursuant to § 407.025.1 of the MMPA and 15 U.S.C. § 2310(d)(2) of the MMWA. The motions were heard on November 21, 2003. In addition, the trial court took up Scott's request, in Count II, his MMPA claim, for injunctive relief pursuant to § 407.025.1. At the conclusion of the November 21, 2003, hearing, the trial court denied the motions for attorney's fees. In denying Scott's request for attorney's fees, the trial court stated, in pertinent part:

> The Court taking into consideration the damages of Plaintiff, the verdict for compensatory damages and punitive damages, judgment is entered in favor of Defendant Blue Springs Ford and against Plaintiff[.]

As to Scott's request for injunctive relief in Count II, it was denied. Having disposed of all post-trial motions, the trial court entered judgment in accordance with the jury's verdicts and its rulings with respect to Scott's request for injunctive relief under the MMPA and the parties' attorney's fees under the MMWA and the MMPA.

Both Scott and BSF appealed to this court. On March 3, 2004, the two appeals were consolidated. On April 11, 2004, we dismissed the consolidated appeal on the basis that the trial court's judgment was not final and appealable because the trial court had failed to rule on Scott's claim of punitive damages, pursuant to § 407.025.1 of the MMPA, after it prohibited the issue from going to the jury, ruling that punitive damages as to Count II could only be assessed by the court.

On June 23, 2004, the trial court entered an amended judgment, which was identical to its November 21, 2003, judgment, except that it entered judgment for BSF on Scott's claim for punitive damages in Count II, pursuant to § 407.025.1 of the MMPA, because Scott had refused "to make an election of remedies between common law fraud and action under [the MMPA]." The judgment also provided that the counts of Scott's first amended petition not submitted to the jury or trial court were abandoned and dismissed with prejudice.

On July 23, 2004, BSF filed a motion for JNOV and a motion for a new trial, or in the alternative, a motion for an order of remittitur. On July 23, 2004, Scott filed a motion to further amend the amended judgment against BSF, a motion for new trial solely on Chapter 407 punitive damages against BSF, and a motion for JNOV or, in the alternative, a new trial against Balderston. On July 28, 2004, the trial court denied all the post-trial motions.

On August 5, 2004, BSF filed a notice of appeal to this court in WD 64428. On August 9, 2004, Scott, pursuant to article V, section 3 of the Missouri Constitution, which grants the Missouri Supreme Court exclusive jurisdiction in all cases concerning provisions of the Missouri Constitution, appealed to the Supreme Court, claiming, *inter alia,* that the trial court had violated his constitutional right to a jury trial, under article I, section 22(a) of the Missouri Constitution, by denying him a trial by

jury on his claim under § 407.025.1 of the MMPA for punitive damages. Subsequently, both BSF and Scott filed, with the Missouri Supreme Court, motions to transfer BSF's appeal to the Supreme Court and to consolidate it with Scott's appeal, which were sustained on November 23, 2004. On November 22, 2005, the Missouri Supreme Court held that, in denying Scott a jury trial on his claim for punitive damages in Count II, the trial court violated Scott's constitutional right to a jury trial. *Scott*, 176 S.W.3d at 142. The Court ordered that Scott's case be remanded to the trial court for a determination by the jury of that issue. *Id.* It further ordered that: "Once there is a jury finding as to the proper amount of punitive damages for each claim, the trial court can determine the extent to which the awards merge and whether the amount of the award is in accordance with *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and enter judgment accordingly." *Id.* The Court then remanded the case back to this court for resolution of the remaining claims raised by the parties on appeal. *Id.*

This appeal follows.

## Scott's Appeal

### I.

In his first remaining point, Point II, Scott claims that the trial court erred in refusing to grant him injunctive relief, as to his MMPA claim in Count II, "enjoining BSF from continued similar misconduct," because having "established BSF's multiple and continuing violations of § 407.020 causing him loss and threatening public safety," § 407.025.1 expressly authorized and mandated such relief. We disagree. Section 407.025.1 does not authorize the injunctive relief that Scott sought against BSF in Count II.

The MMPA was enacted to preserve fundamental honesty, fair play, and right dealings in public transactions. *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo.App.2006). "[T]he MMPA supplements the definition of common law fraud, eliminating the need to prove an intent to defraud or reliance." *Id.* In that regard, § 407.025.1 reads:

Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and *may provide such equitable relief as it deems necessary or proper.*

(Emphasis added.) Scott points to the language of the statute: "may provide such equitable relief as it deems necessary or proper," as authorizing a trial court to grant "injunctive relief for the protection of the public in cases under § 407.025 brought by individuals," such as himself. Scott does not cite, and our research does not disclose, any decision of our appellate courts interpreting § 407.025.1 in that manner. Thus, the question presented in this point turns on an interpretation of § 407.025.1, which is a question of law we determine *de novo*. *Windsor v. Windsor*, 166 S.W.3d 623, 632 (Mo.App.2005).

When interpreting a statute, we are to determine the intent of the legisla-

ture, giving the language used its plain and ordinary meaning, and to give effect to that intent, if possible. *Cline v. Teasdale,* 142 S.W.3d 215, 222 (Mo.App.2004). If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then we are bound by that intent and cannot resort to any statutory construction in interpreting the statute. *Preston v. State,* 33 S.W.3d 574, 579 (Mo.App.2000). "When the legislative intent cannot be ascertained from the language of the statute, by giving it its plain and ordinary meaning, the statute is considered ambiguous and only then can the rules of statutory construction be applied." *Id.* "Statutory provisions relating to the same subject matter are considered *in pari materia.* ..." *Id.* (citation omitted). Accordingly, "[w]e are required to interpret and apply statutory provisions with reference to each other to determine legislative intent." *Id.* (internal quotation marks and citation omitted).

 There is no dispute that the language of § 407.025.1, "[t]he court may, in its discretion, ... provide such equitable relief as it deems necessary or proper[,]" relied upon by Scott in this point, expressly authorizes a trial court to grant "equitable relief" to a private party who is entitled to relief under § 407.025.1 for violations of § 407.020. And, there is no dispute that, as a general proposition, as to the law of equity, equitable relief includes injunctive relief. *Supermarket Merch. & Supply, Inc. v. Marschuetz,* 196 S.W.3d 581, 585 (Mo.App.2006). From this, Scott reasons that in authorizing the trial court, in its discretion, *see In re Estate of Parker,* 25 S.W.3d 611, 616 (Mo.App.2000) (stating that the use of the term "may" means that the act is discretionary), to "provide such equitable relief as it deems necessary or proper[,]" the legislature necessarily intended that the

trial court could grant a private individual injunctive relief protecting the public in the future from the same violations of § 407.020 visited upon the individual plaintiff. However, in reasoning as he does, Scott is reading the language of the statute in a vacuum, which we cannot do. It must be read in context. *See Preston,* 33 S.W.3d at 579 (stating that "[s]tatutory provisions relating to the same subject matter are considered *in pari materia*" and, as such, "[w]e are required to interpret and apply statutory provisions with reference to each other to determine legislative intent" (internal quotation marks and citations omitted)).

Read in context, it appears clear to us that the General Assembly intended § 407.025.1 to provide an avenue for a private plaintiff, who has suffered an ascertainable loss, in violation of § 407.020, to bring a private cause of action seeking individual redress for the wrongs perpetrated against him, in violation of the Act, rather than relying on the attorney general to bring a cause of action, pursuant to § 407.100. The "equitable relief" language of the statute is modified by the phrase "as [the court] deems necessary or proper." This language is consistent with an interpretation that the legislature intended to give the trial court broad powers to address and right the wrongs perpetrated against the individual plaintiff. Granting injunctive relief so as to protect the future interests of the general public, as Scott argues as the legislative intent in interpreting § 407.025.1, does not further that purpose.

Further supporting our interpretation of § 407.025.1, that it does not authorize the trial court to grant injunctive relief to protect the general public, is the fact that the legislature, in § 407.100, expressly authorizes the attorney general to seek an injunction to prevent future unlawful acts, as

declared in Chapter 407. In that regard, § 407.100.1 reads:

> Whenever it appears to the attorney general that a person has engaged in, is engaging in, or is about to engage in any method, act, use, practice or solicitation, or any combination thereof, declared to be unlawful by this chapter, the attorney general may seek and obtain, in an action in a circuit court, *an injunction prohibiting such person from continuing* such methods, acts, uses, practices, or solicitations, or any combination thereof, or engaging therein, or doing anything in furtherance thereof.

(Emphasis added.) Unlike § 407.025.1, § 407.100.1 speaks expressly in terms of "injunction" and of the "prohibiting" of the "continuing" of future unlawful acts, as provided in Chapter 407. Moreover, unlike § 407.025.1, which references what a "prevailing party" can receive in the way of relief for unlawful acts perpetrated against the party, § 407.100 clearly speaks to protecting the public at large, with no mention of protecting a "prevailing party" or one individual. It is inconceivable to us that the legislature would have written these two sections so differently if it had intended, as Scott claims, that both a private plaintiff and the attorney general are to have the same authority—protecting the general public by injunction from future unlawful acts, as declared under Chapter 407. While Scott makes some public policy arguments as to why the legislature should empower private individuals to act for the public in case of inaction by the attorney general, good public policy or not, we must be constrained by the statutory language employed, which when read in context, clearly points to the fact that individual plaintiffs, under § 407.025.1, are not empowered to seek injunctive relief to pro-

tect the public from unlawful acts, as declared in Chapter 407.

Point denied.

## II.

In Point III, as to his claims against Balderston, Scott claims that the trial court erred in excluding evidence of similar sales of wrecked vehicles by BSF between 2000 and 2002 and evidence of a verdict and settlement in two other cases involving the sale of wrecked vehicles by BSF and Wholesale, because it was relevant to show Balderston's intent to conspire with BSF to sell rebuilt wrecked vehicles, like Scott's Ford Explorer, during the relevant time frame, and to rebut Balderston's defense at trial that while "there may have been some problems with wrecked cars sold in the 1990s, [when] he and BSF had learned about them[, they] had taken multiple steps to correct those problems." Specifically, he claims that the trial court erred in excluding the testimony of five witnesses who would have testified that BSF had sold them used vehicles between 2000 and 2002 without disclosing that they had been wrecked and repaired, in excluding evidence of a similar case, the case of *Grabinski v. Blue Springs Ford Sales,* 136 F.3d 565, 566–67 (8th Cir.1998), where damages were awarded against BSF in the amount of $217,835, and in excluding evidence in another similar case, the Looney case, in which BSF offered to settle with the buyer. Scott claims that this evidence not only demonstrated that Balderston had conspired with BSF to sell wrecked vehicles, but that it also rebutted Balderston's defense that upon their learning about a problem with a wrecked and repaired vehicle being sold without disclosure, he and BSF sought to make it right with the buyer and had adopted corrective measures to prevent future sales of wrecked and repaired vehicles to unknowing buyers.

At trial, Balderston, Chris Young, the general manager of BSF, and Scott Barrelman, the collision center manager of BSF, testified that upon learning that BSF had sold vehicles without disclosing that they had been wrecked and repaired, BSF sought not only to make it right with those buyers, but had adopted corrective measures to prevent future such sales. As Scott contends, this was an obvious attempt to demonstrate that there was no conspiracy to dupe unsuspecting buyers. At trial, Scott introduced, and the court admitted, by stipulation, a letter from BSF to Scott, dated May 11, 2000, which reads, in pertinent part: "Blue Springs Ford will repurchase the Explorer from you for $ 25,400.40. If you no longer have the Explorer, Blue Springs Ford will still reimburse you the $25,400.40." In support of his defense at trial, Balderston argued that the letter showed that he and BSF were trying "to make it right" with Scott, "trying to be fair," because it was "the right thing to do," and that they never acted with any "bad motivation." To counter that evidence, Scott sought to introduce evidence of other alleged similar sales between 2000 and 2002. He contends that evidence of past sales of wrecked and repaired vehicles without disclosure was relevant and admissible because it was the best evidence of an intent to defraud. As to the evidence of the *Grabinski* judgment against BSF for $217,835 and evidence of the Looney settlement offers, Scott contends that it was relevant and admissible in that it showed that the true intent of the settlement letter to Scott was not, as characterized by Balderston at trial, to do the "right thing," but was simply to avoid another large judgment or lawsuit.

On July 16, 2003, Balderston filed a motion *in limine* to preclude any evidence of similar occurrences, which was heard on July 17, 2003. At the motion hearing, Scott offered a "Short Synopsis of Pattern Vehicles," listing twenty-three sales he intended to offer at trial as similar occurrences to show, *inter alia,* that: (1) BSF and Balderston had engaged in fraudulent practices by misrepresenting that their used vehicles had not been previously wrecked; and (2) to impeach Balderston's defense that upon learning of a problem with wrecked and repaired vehicles, he and BSF sought to make it right with the buyer and adopt corrective measures to prevent future sales of wrecked vehicles to unknowing buyers. On July 29, 2003, the trial court ruled that Scott would be allowed to introduce, at trial, evidence of twelve sales as similar occurrences: the Grabinski vehicle, sold in 1993; the Looney vehicle, sold in 1992 and resold in 1994; the Hall vehicle, sold in 1993; the Craig vehicle, sold in 1993; the Dover vehicle, sold in 1995; the Brooker vehicle, sold in 1995; the Garrison vehicle, sold in 1996; the Given vehicle, sold in 1996; the Skinner vehicle, sold in 1997; the Simpson vehicle, sold in 1998; the Morrison vehicle, sold in 1998; and the Frietag vehicle, sold in 1999. However, the court excluded evidence of the other thirteen sales. The thirteen excluded sales included the sale of the Oliver vehicle, sold in 2000; the Hendrix vehicle, sold in 2000; the Hall vehicle, sold in 2001; the Mehaffie vehicle, sold in 2001; and the VonDavid vehicle, sold in 2002. It is the exclusion of evidence of these five similar sales that Scott claims in this point was erroneous.

As to the allowed evidence of other similar sales, the trial court limited the scope of examination to: (1) the date of the sale, (2) the dealership involved, (3) the vehicle involved, (4) the salesperson involved, (5) the representation made by the salesperson, and (6) the damage incurred. Thus, while Scott was allowed to introduce evidence concerning the sale of the Grabinski vehicle, he was not allowed to introduce

evidence that Grabinski had received a judgment against BSF in federal court in the amount of $217,835. And, while Scott was allowed to introduce evidence as to the sale of the Looney vehicle, he was not allowed to introduce evidence showing that BSF had made settlement offers to Looney. It is the exclusion of this evidence of similar sales, along with the exclusion of the evidence concerning the *Grabinski* judgment and the Looney settlement offers, that Scott claims in this point was erroneous.

 Scott first claims that this evidence was relevant to show Balderston's intent to conspire with BSF to sell rebuilt wrecked vehicles, like Scott's Ford Explorer, during the relevant time frame. To prove a claim of civil conspiracy, the plaintiff must establish that: "[ (1) ] two or more persons, [ (2) ] with an unlawful objective, [ (3) ] committed at least one act in furtherance of a conspiracy[, (4) ] after a meeting of the minds[,] and [ (5) ] thereby damaged [the] plaintiff." *Taylor v. Richland Motors*, 159 S.W.3d 492, 496 (Mo. App.2005). "Conspiracy is not itself actionable in the absence of an underlying wrongful act or tort." *Id.* (internal quotation marks and citation omitted). Here, Scott alleged civil conspiracy claims against Balderston in Counts IX, X, and XI of his petition, based on his underlying claims of fraud, MMPA and negligent misrepresentation against BSF. Scott claims that the challenged evidence in this point that was excluded was relevant and admissible "as direct evidence of acts of the conspiracy."

 Scott also claims that the evidence of the other sales was relevant and admissible to rebut or impeach Balderston's evidence that when BSF found out about the problems with the sale of wrecked vehicles, it adopted corrective measures to prevent future such sales and that in trying to settle with Scott, BSF was acting in good faith. "A party may introduce evidence to rebut that of his or her adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible." *Govreau v. Nu–Way Concrete Forms, Inc.*, 73 S.W.3d 737, 743 (Mo. App.2002). The decision to admit this evidence is within the trial court's discretion. *Id.* "'Impeachment' is directed to the credibility of a witness for the purpose of discrediting the witness and ordinarily furnishes no factual evidence, whereas 'contradiction' is directed to the accuracy of a witness' [sic] testimony and supplies additional evidence." *Id.* (citation omitted). "Contradiction inherently involves some impeachment because any conflicting evidence would serve to question the reliability of the witness's memory, observation, or honesty." *Id.* at 743–44.

 Trial courts have wide discretion in the admissibility of evidence of similar occurrences. *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 151 (Mo. *banc* 1998). Our review of the admission or exclusion of such evidence is "limited to whether the trial court determined that the evidence was relevant and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice and confusion of issues." *Id.* A trial court abuses its discretion, as to the admissibility of evidence, when its ruling is clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* If reasonable people could disagree about the trial court's decision, it cannot be said that there was an abuse of discretion. *Id.* However, even if we find that the trial court abused its discretion, reversal is not necessarily mandated. *Alberswerth v.*

*Alberswerth,* 184 S.W.3d 81, 100 (Mo.App. 2006). An error in the admission or exclusion of evidence will only result in reversal if the appellant was prejudiced by it. *Id.* An error is prejudicial if it affects the result or the outcome of the case. *Id.*

Even assuming, *arguendo,* that Scott is correct that the trial court erred in excluding the evidence in question, his claim still fails in that he has failed to show any resulting prejudice. As noted *supra,* for an error in the exclusion of evidence to constitute reversible error, the appellant must demonstrate resulting prejudice by showing that had the excluded evidence been admitted, the outcome of his case would have been different. *Id.* Hence, to demonstrate reversible error as to his claim in this point, Scott has the burden to show not only that it was error, but that had the evidence in question been admitted, the jury would have found for Scott on one or more of the conspiracy counts submitted to the jury. *Id.*

In his argument as to Point III, Scott, in a very brief and conclusory fashion, argues that because the evidence in question was excluded "it is obvious how this was simply not a fair trial of Scott's case." Scott makes no other claim regarding prejudice in this point. He fails to explain how the admission of the evidence in question would have made it more likely that the jury would have found for him on any of the three conspiracy counts against Balderston which were submitted to the jury. As a result of the substantial deficiencies in Scott's argument, we are at a total loss to understand what prejudice he is claiming that he suffered from the trial court's alleged error so as to constitute reversible error, entitling him to the relief he requests in Point II. As such, since Scott has wholly failed to advise us in his argument of what prejudice he suffered from the trial court's alleged trial error, there is

nothing for us to review. *See Wood v. Wood,* 94 S.W.3d 397, 404 (Mo.App.2003) (holding that where appellant fails to explain in his argument what prejudice he has suffered from the trial court's alleged trial error, there is nothing for us to review).

This point must fail, not only because Scott failed to develop an argument showing prejudice from the exclusion of the evidence in question, but because we fail to see how that evidence would bear on the issue of a conspiracy by Balderston with BSF to commit fraud, misrepresentation in violation of the MMPA, or negligent misrepresentation. As discussed, *supra,* to demonstrate prejudice as to this claim in this point, Scott had to show that but for the exclusion of the evidence in question, the jury would have returned verdicts in his favor as to his conspiracy claims against Balderston in Counts IX, X and XI. We fail to see how the evidence in question had any relevancy as to establishing the proof elements of a conspiracy, that: "[ (1) ] two or more persons, [ (2) ] with an unlawful objective, [ (3) ] committed at least one act in furtherance of a conspiracy[, (4) ] after a meeting of the minds[,] and [ (5) ] thereby damaged [the] plaintiff." *Taylor,* 159 S.W.3d at 496. The evidence in question went only to the merits of the underlying claims against BSF, on which the jury found for Scott, having returned verdicts for him on those claims. None of the excluded evidence would have aided Scott in linking Balderston to BSF's illegal actions such that the jury would have found for him on one or more of his conspiracy counts against Balderston.

Point denied.

### III.

In Point IV, Scott claims that the trial court erred in denying his request for

attorney's fees as to his MMPA claim, Count II, and his MMWA claim, Count VIII, as expressly provided in § 407.025.1 of the MMPA and 15 U.S.C. § 2310(d)(1) of the MMWA, because in doing so, it misapplied the law by taking into consideration the amount of the awards of compensatory and punitive damages made to Scott. We disagree.

With respect to the award of attorney's fees, "Missouri has adopted the American Rule; that is, absent statutory authorization or contractual agreement, with few exceptions, each litigant must bear his own attorney's fee." *David Ranken, Jr. Technical Inst. v. Boykins,* 816 S.W.2d 189, 193 (Mo. *banc* 1991). The "exceptions" are limited to those cases involving "very unusual circumstances" or to cases "where the natural and proximate result of a breach of duty is to involve the wronged party in collateral litigation." *Id.* (citation omitted).

Here, having prevailed on his MMPA claim in Count II and his MMWA claim in Count VIII, Scott filed a motion on November 21, 2003, seeking attorney's fees from BSF, in the amount of $179,904, pursuant to § 407.025.1, as to Count II, and pursuant to 15 U.S.C. § 2310(d)(2), as to Count VIII. On June 23, 2004, the trial court, in its amended judgment, denied Scott's request for attorney's fees on both counts, stating:

> [i]t is further ordered, on Plaintiff's claims for Attorney's fees pursuant to Magnuson–Moss Warranty Act and pursuant to the Missouri Merchandising Practices Act, the Court taking into consideration the damages of Plaintiff, the verdict for compensatory damages and punitive damages, judgment is entered in favor of Defendant Blue Springs Ford and against Plaintiff[.]

Scott claims that both § 407.025.1 and 15 U.S.C. § 2310(d)(2) must be read as pro-

hibiting the trial court from denying his request for attorney's fees based on the actual and punitive damages that were awarded to him, such that the trial court erroneously declared and applied the law in denying his request for attorney's fees, pursuant to § 407.025.1 and 15 U.S.C. § 2310(d)(2), on the basis stated. Thus, our review of the error claimed in this point is not for an abuse of discretion. *See Structure & Design Unlimited, Inc. v. Contemporary Concepts Bldg. & Design, Inc.,* 151 S.W.3d 904, 910 (Mo.App.2004) (recognizing that normally we review a trial court's decision as to a request for attorney's fees for an abuse of discretion). Rather, because the issue raised by Scott in this point involves a question of law, the interpretation and application of § 407.025.1 and 15 U.S.C. § 2310(d)(2), our review is *de novo. Windsor,* 166 S.W.3d at 632.

When interpreting a state statute, we are to determine the intent of the legislature, giving the language used its plain and ordinary meaning, and to give effect to that intent, if possible. *Cline,* 142 S.W.3d at 222. If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then we are bound by that intent and cannot resort to any statutory construction in interpreting the statute. *Preston,* 33 S.W.3d at 579.

We will discuss whether the trial court erroneously declared and applied the law in denying him attorney's fees, with respect to § 407.025.1 and 15 U.S.C. § 2310(d)(2), separately.

### A. Section 407.025.1—MMPA Claim, Count II

Section 407.025.1 of the MMPA provides, in pertinent part: "The court may, in its discretion, award punitive dam-

ages and *may* award to the prevailing party attorney's fees, based on the amount of time reasonably expended[.]" (Emphasis added.) Scott does not point to any specific language in the statute that supports his contention that the trial court, in determining an award of attorney's fees, cannot take into consideration the awards of actual and punitive damages to the prevailing party. And, he does not cite, and our research does not disclose, any decisions of our state appellate courts interpreting § 407.025.1 in that manner. Rather, he relies solely on the Eighth Circuit's decision in *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1028, in which the court held that: "[the] trial court abused its discretion when it denied [plaintiff] attorney's fees simply because it felt that the punitive damages award was 'generous' and because it did not want to 'pad' the punitive damage award with a fee award in this case." (Internal quotation marks omitted.) "While federal cases interpreting Missouri law are persuasive, they are not binding on this court interpreting our own state statute." *Lagares v. Camdenton R–III Sch. Dist.*, 68 S.W.3d 518, 528 (Mo.App.2001) (internal quotation marks and citation omitted). In holding as it did, the *Grabinski* court relied solely on the Missouri Supreme Court's decision in *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64 (Mo. banc 1989). Because the clear intent of our legislature, with respect to an award of attorney's fees pursuant to § 407.025.1, by giving the language of the statute its plain and ordinary meaning, is contrary to *Grabinski*, and because the *Grabinski* court misread *O'Brien*, we reject *Grabinski* to the extent that it holds that: "[the] trial court abused its discretion when it denied [plaintiff] attorney's fees simply because it felt that the punitive damages award was 'generous' and because it did not want to 'pad' the punitive damage award with a fee award in this case." 203

F.3d at 1028 (internal quotation marks omitted).

In using the term "may" in § 407.025.1, as to the award of attorney's fees, the legislature clearly intended that the trial court could, but was not required to, award attorney's fees to a prevailing party, or in other words, that such an award is within the trial court's discretion. *See In re Estate of Parker*, 25 S.W.3d at 616 (stating that the "[u]se of the word 'may' in a statute implies alternate possibilities and that the conferee of the power has discretion in the exercise of the power"); *see also Carpenter v. Discount Motors, Inc.*, 652 S.W.2d 716, 718 (Mo.App.1983) (holding that § 407.025 "leaves little, if any, room to doubt that the ultimate decision as to whether any punitive damages or attorney fees will be granted is invested to the sound discretion of the court"). There is nothing in the language of the statute itself to suggest, as Scott contends, that the trial court, in determining whether to award attorney's fees, is prohibited from considering the awards of actual and punitive damages to the prevailing party. The statute is totally silent as to what factors the trial court can, cannot, or should consider in determining whether to award attorney's fees. The only limitation of § 407.025.1, with respect to the trial court's discretion to award attorney's fees, is the mandate that in determining the amount of an award, the trial court is required to consider "the amount of time reasonably expended" by the prevailing party's attorney.

■ Although interpreting the award of attorney's fees pursuant to § 431.180, rather than § 407.025.1, the Supreme Court's holding in *Vance Bros., Inc., v. Obermiller Const. Services, Inc.*, 181 S.W.3d 562, 564 (Mo. banc 2006), is instructive on the issue presented in this point. There, the Court was faced, *inter*

*alia,* with the issue of whether an award of attorney's fees, pursuant to § 431.180, was contingent on there being an award of interest to the prevailing party. *Id.* Section 431.180.2 reads, in pertinent part:

> Any person who has not been paid in accordance with subsection 1 of this section may bring an action in a court of competent jurisdiction against a person who has failed to pay. The court may in addition to any other award for damages, award interest at the rate of up to one and one-half percent per month from the date payment was due pursuant to the terms of the contract, and reasonable attorney fees, to the prevailing party.

In rejecting the proposition that under the statute, an award of attorney's fees to the prevailing party was contingent on an award of interest, the Court stated:

> The statute places discretion in the court to award interest and attorney fees. *No restriction* is placed on the court's discretion to award attorney fees even if interest is not awarded. As the statute is clear, resort to other similar statutes to divine the meaning of section 431.180 is not permitted.

*Vance Bros., Inc.,* 181 S.W.3d at 564 (emphasis added). In other words, in the clear absence of an express restriction in the statute on the discretion of the trial court to award attorney's fees, no restriction may be read into the statute by referencing a similar statute. Applying that proposition, here, the fact that § 407.025.1 in no way conditions or restricts the award of attorney's fees to a prevailing party, other than to require the trial court to consider the number of hours expended by the prevailing party's attorney, speaks loudly and clearly that the legislature never intended that the trial court be prohibited from considering the award of damages to the prevailing party in determining whether to award attorney's fees under the statute.

As noted, *supra,* in contending that the trial court was prohibited by § 407.025.1 from denying him attorney's fees on his MMPA claim, Scott relies solely on the Eighth Circuit's holding in *Grabinski* interpreting the statute. In *Grabinski,* the plaintiff sued BSF in the United States District Court of Western Missouri, alleging that BSF violated the MMPA when it sold her a vehicle that had been wrecked and repaired, without disclosing that fact to her. 203 F.3d at 1024–25. The jury returned a verdict in favor of plaintiff, awarding her actual damages and punitive damages, *id.* at 1026; however, the district court, after remand by the Eighth Circuit, denied her § 407.025.1 motion for an award of attorney's fees, on the basis that she had received a large punitive damage award, *id.* at 1028. The plaintiff appealed to the Eighth Circuit and claimed that under Missouri law, the trial court erred in denying her attorney's fees on that basis. *Id.* at 1027. The Eighth Circuit, applying what it believed to be controlling Missouri state law as to an award of attorney's fees, pursuant to § 407.025.1, agreed. *Id.*

In reversing the trial court's denial of the plaintiff's § 407.025.1 motion for attorney's fees in *Grabinski,* the Eighth Circuit relied exclusively on the Missouri Supreme Court's decision in *O'Brien.* Although conceding that *O'Brien* did not deal with an award of attorney's fees under § 407.025.1, but an award under § 407.545, which admittedly, unlike § 407.025.1, *mandated* an award of attorney's fees, the *Grabinski* court, seizing on the mere fact that the Missouri Supreme Court had cited two federal cases interpreting 42 U.S.C. § 1988(b): *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and *Tex. State Teacher's Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 109 S.Ct.

1486, 103 L.Ed.2d 866 (1989), reasoned that the Court was implicitly adopting the rule recognized in federal cases interpreting § 1988(b),[2] which contained discretionary language virtually identical to that in § 407.025.1. 203 F.3d at 1027–28. Finding that the rule in federal cases, interpreting § 1988(b), prohibited the trial court from denying attorney's fees on the basis of the amount of the damage award to the plaintiff, the *Grabinski* court, applying what it believed to be the holding in *O'Brien*, held that in denying an award of attorney's fees, under § 407.025.1, based on the punitive damages awarded to the plaintiff, the district court had erred, and it reversed. 203 F.3d at 1028. The *Grabinski* court's reading of *O'Brien* is wrong. Our reading of the statute and applicable law leads us to believe that Missouri law is contrary to *Grabinski*.

In *O'Brien*, the jury returned a verdict in favor of the plaintiff on his claim of odometer fraud, brought pursuant to § 407.536. 768 S.W.2d at 66–67. Pursuant to § 407.545, which was repealed effective January 1, 1984, the plaintiff was entitled to an award of attorney's fees. Section 407.545 read, in pertinent part:

> Any person who, with intent to defraud, violates any of the provisions ... shall be liable in civil damages ... and, in the case of any successful action to enforce the liability created by this section, the costs of the action together with reasonable attorney fees as determined by the court.

Pursuant to that statute, the trial court awarded $1,000 in attorney's fees to the plaintiff. *O'Brien*, 768 S.W.2d at 67. Both the plaintiff and defendant appealed. *Id.* On appeal to the Missouri Supreme Court, the plaintiff claimed that the trial court erred in awarding attorney's fees in the sum of $1,000 because the evidence supported an award of $28,000. *Id.* at 71. The Court never reached the merits of this issue; instead, it reversed and remanded the issue to the trial court for reconsideration because it had refused to hear the parties' evidence on the issue. *Id.* at 72.

A careful reading of *O'Brien* clearly shows that the citation to the federal cases by the Court, relied upon by the *Grabinski* court for its interpretation of § 407.025.1, was done solely in support of the Court's directive that, in determining the award of attorney's fees on remand, attorney's fees having been mandated by the statute, one factor to be considered was the result achieved. *O'Brien*, 768 S.W.2d at 71. This could hardly be interpreted as signaling, as the *Grabinski* court held, that the Missouri Supreme Court was implicitly adopting the federal rule, with respect to § 1988(b), that in determining an award of attorney's fees, pursuant to § 407.025.1, the trial court, as a matter of law, cannot consider the award of damages to the plaintiff. The statute in question in *O'Brien* mandated attorney's fees such that the Court's citation of the federal cases in question did not bear on the issue that confronted the *Grabinski* court and now confronts us. Hence, *Grabinski*, besides being contrary to the clear language of the statute, which we discuss, *supra*,

---

**2.** 42 U.S.C. § 1988 states in pertinent part that: "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C.A. § 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]"

was not well reasoned, and thus, is of no help to Scott in this case.

 The fact that § 407.025.1 does not expressly mandate an award of attorney's fees, but makes it a matter of discretion with the trial court, does not mean that the trial court's granting or not granting of attorney's fees is not subject to appellate review. Where the legislature statutorily authorizes an award of attorney's fees in the discretion of the trial court, as is the case in § 407.025.1, the granting or refusal to grant attorney's fees is reviewable for an abuse of discretion. *Tate v. Golden Rule Ins. Co.*, 859 S.W.2d 831, 835 (Mo.App.1993). The trial court abuses its discretion in awarding attorney's fees when its award is "either arbitrarily arrived at or so unreasonable as to indicate indifference and lack of proper judicial consideration." *Id.* An award of attorney's fees is presumed to be correct, with the burden on the complaining party to prove otherwise. *Id.* When reviewing a challenge to an award of attorney's fees, we give "deference to the discretion of the trial judge who, by virtue of his or her office and experience, is considered an expert in determining the proper amount of compensation for legal services." *Id.* (citation omitted). And, given this expertise, and because the trial court tried the case such that it is presumed to be acquainted with all the issues involved, it may set the amount of attorney's fees without the aid of evidence. *Id.; In re Alcolac, Inc.*, 903 S.W.2d 680, 682 (Mo.App.1995) (*citing Roberts v. McNary*, 636 S.W.2d 332, 338 (Mo. *banc* 1982); *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. *banc* 1980)).

Scott makes no claim that the trial court abused its discretion in refusing to grant him attorney's fees on his MMPA claim, pursuant to § 407.025.1. Rather, his only claim is that the trial court erroneously declared and applied § 407.025.1 by refus-

ing to grant him attorney's fees, given the actual and punitive damages received. As discussed, *supra*, that claim has no merit.

## B. 15 U.S.C. § 2310(d)(2)—MMWA Claim, Count VIII

As to his MMWA claim, Scott sought attorney's fees pursuant to 15 U.S.C. § 2310(d)(2). That request for attorney's fees was rejected by the trial court on the same basis that his request for attorney's fees on his MMPA claim, pursuant to § 407.025.1, was denied, which Scott claims was an erroneous declaration and application of the law.

 Section 2310(d)(2) of 15 U.S.C. reads, in pertinent part:

If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he *may* be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (*including attorneys' fees based on actual time expended*) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, *unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.*

(Emphasis added.) Hence, like § 407.025.1, 15 U.S.C. § 2310(d)(2) vests the trial court with discretion in whether to award attorney's fees to a prevailing party. *See Hibbs v. Jeep Corp.*, 666 S.W.2d 792, 799 (Mo.App.1984) (holding that, pursuant to 15 U.S.C. § 2310(d)(2), "upon a consideration of the facts, the trial court had the discretion to deem the requested award of attorneys' fees as inappropriate"); *Messana v. Mercedes–Benz of N.A., Inc.*, 2000 WL 988163 *1 (N.D.Ill. July 18, 2000) (15 U.S.C. § 2310(d)(2) gives the court considerable discretion in calcu-

lating the amount of fees to be awarded). And, as in the case of § 407.025.1, Scott does not point to any language in 15 U.S.C. § 2310(d)(2) that supports his contention that the trial court, in determining an award of attorney's fees, cannot take into consideration the awards of actual and punitive damages to the prevailing party. While it is well settled that in construing a federal statute, such as 15 U.S.C. § 2310(d)(2), "the decisions of the United States Supreme Court ... interpreting that statute are binding[,]" *Fox v. McDonnell Douglas Corp.*, 890 S.W.2d 408, 410 (Mo.App.1995), and "lower federal court opinions construing [that] statute are examined respectfully for such aid and guidance as may be found therein[,]" *Reynolds v. Diamond Foods & Poultry*, 79 S.W.3d 907, 910 (Mo. *banc* 2002), Scott does not cite, and our research does not disclose, any decisions of our federal courts interpreting 15 U.S.C. § 2310(d)(2) in the manner urged by him. Rather, he solely relies on the Eighth Circuit's decision in *Grabinski*, which was not interpreting 15 U.S.C. § 2310(d)(2).

In the absence of any cases that have interpreted 15 U.S.C. § 2310(d)(2), either state or federal, and *Grabinski* not being persuasive on the issue presented, as discussed, *supra*, we are left to interpret 15 U.S.C. § 2310(d)(2). Federal statutes are interpreted in the same manner as state statutes. "Where ... the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Cacioppo*, 460 F.3d 1012, 1016 (8th Cir.2006) (citation omitted).

Giving the language of 15 U.S.C. § 2310(d)(2) its plain and ordinary meaning, it is clear that the statute authorizes an award of attorney's fees to the prevailing party within the sound discretion of the trial court. And, as in the case of § 407.025.1, there is nothing in the language of 15 U.S.C. § 2310(d)(2) to suggest, as Scott contends, that the trial court, in determining whether to award attorney's fees, is prohibited, as part of its discretion, from considering the awards of actual and punitive damages to the prevailing party. The statute is totally silent as to what factors the trial court can, cannot, or should consider in determining whether to award attorney's fees. The only limitation of 15 U.S.C § 2310(d)(2), with respect to the trial court's discretion to award attorney's fees, is a limitation similar to the limitation found in § 407.025.1, that in determining the amount of an award, the trial court is required to consider the amount of time "actually" expended by the prevailing party's attorney. Hence, in the absence of any language in the statute limiting the trial court's discretion to award attorney's fees, we fail to see how it could be interpreted as prohibiting the trial court from considering the award of actual and punitive damages to the prevailing party in determining an award of attorney's fees under the statute, as Scott contends.

As in the case of his request for attorney's fees, pursuant to § 407.025.1, Scott makes no claim that the trial court abused its discretion in refusing to grant him attorney's fees on his MMWA claim, pursuant to 15 U.S.C. § 2310(d)(2). Rather, his only claim is that the trial court erroneously declared and applied the statute by refusing to grant him attorney's fees given the actual and punitive damages he was awarded as to his MMWA claim. As discussed, *supra*, that claim has no merit.

Point denied.

### BSF's Cross–Appeal

### I.

In Point I of its cross-appeal, BSF claims that the trial court erred in admit-

ting, over its objection, evidence of alleged similar occurrences of sales of wrecked vehicles to show, *inter alia,* a fraudulent intent in the sale of the Explorer to Scott, because it was inadmissible against BSF, in that the sales were conducted by separate legal entities, BSN and Wholesale, not BSF. The only prejudice claimed by BSF as to this alleged trial error is that the admission of the challenged evidence caused excessive awards of compensatory and punitive damages to Scott. As such, this claim logically fits within BSF's claims raised in Points III and IV, claiming that the compensatory and punitive damage awards to Scott were grossly excessive, due, in part, to the erroneous admission of the evidence challenged in this point. Hence, we will address BSF's claim in this point in Points III and IV, *infra.*

## II.

In Point II, BSF claims that the trial court erred in allowing, over its objection, Scott's expert, Richard Diklich (Diklich), to testify as to his opinion regarding safety concerns with the Explorer due to defective repairs, because Scott did not lay a proper foundation, in accordance with § 490.065, for the admission of such expert testimony and because Diklich did not state, as required, that his opinion was rendered "within a reasonable degree of certainty." Specifically, as to the § 490.065 foundation issue, BSF claims that it was error to admit Diklich's testimony, that due to defective repairs made to the area around the windshield of the Explorer, the windshield was susceptible to popping out and the roof was susceptible to being crushed during an accident, putting its occupants in danger, in that: (1) to be qualified to render such an opinion, in accordance with § 490.065.1, Diklich had to be an engineer and was not; and (2) without crashworthy testing, which he did not do, his opinion as to the issues of

windshield retention and the structural integrity of the Explorer's roof was based on mere assumptions, which did not satisfy § 490.065.3. As to the remaining issue in this point, he claims that it was error to admit Diklich's testimony in that in rendering his opinion, he never testified that it was to a degree of certainty.

We will address the § 490.065 foundation and degree-of-certainty issues separately.

### A. Section 490.065 Foundation for Admission

As to Scott's failure to satisfy the foundation requirements of § 490.065, for the admission of Diklich's challenged expert opinion testimony, BSF claims that Scott did not demonstrate, as required, that Diklich: (1) was qualified to render an expert opinion as to the Explorer being unsafe due to defective repairs around the windshield; and (2) in rendering his opinions, was relying on facts and data of the type reasonably relied on by experts in the field. We disagree.

BSF filed a pre-trial motion *in limine,* which was overruled, seeking, *inter alia,* to prohibit Scott from introducing Diklich's expert testimony at trial that due to defective repairs made to the area around the windshield, the occupants of the Explorer were at risk during an accident due to the windshield's susceptibility to popping out and the roof's susceptibility to being crushed. At trial, BSF renewed its objection, which was also overruled. In this point, BSF complains about the following testimony of Diklich being admitted over its objection:

> The areas, the two areas that I saw that gave me rise to concern for safety issues were in the left hand A pillar and the rough header area, that's where the windshield goes in up in that upper left

hand corner. Right in the sun visor, where the sun visor attaches on the interior behind that. And the rocker panel areas where the welds had corroded away and the rockers where the exterior skin wasn't adhered well to the rocker and the rocker itself had started to rot away for lack of a better term. That will show up in my digital photos. So those two areas that I had concerns about interior occupancy or the ability for the vehicle to hold together type safety. . . .

[I]n the A pillar area where there's a lot of rusting and corrosion around the windshield installation and adhesion area, that's a cause for concern because windshields quite often fail to adhere to the pillars in the windshield area of a car in an accident and they can come out. . . .

Rocker panel area is considered secondary safety. It ties in the lock pillar and it ties in several other areas. So the outside skin when it goes into that rocker area, if that's been damaged and distorted or drilled through and rewelded, it doesn't hold up as well. On this particular vehicle it's a full frame vehicle. So your frontal crash energy absorption is typically done by the frame and the front structure. You would get into issues of whether or not the lock pillar would support the vehicle well in a rollover, if that area wasn't tied in tight.

▬▬ The admission of expert testimony is governed by § 490.065. *McGuire v. Seltsam*, 138 S.W.3d 718, 720 (Mo. *banc* 2004). Failure to satisfy its foundation requirements renders proffered expert witness testimony inadmissible. *Id.* at 721. Hence, in claiming in this point that the evidence in question was inadmissible because the foundation requirements of § 490.065 were not satisfied, BSF first raises a legal issue, the application of the

law, which we review *de novo*. *Seidner v. Webster*, 201 S.W.3d 104, 108 (Mo.App. 2006). If we find that there is evidence in the record that would support the satisfaction of the foundation requirements of § 490.065 for the admission of the evidence in question, then the decision whether to admit the evidence becomes a matter of discretion with the trial court. *See Whitnell v. State*, 129 S.W.3d 409, 413 (Mo.App. 2004) (stating that "the admission or exclusion of expert opinion testimony is a matter within the discretion of the trial court"). A trial court abuses its discretion in admitting expert testimony when its ruling is clearly against the logic of the circumstances then before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Eltiste v. Ford Motor Co.*, 167 S.W.3d 742, 750 (Mo.App. 2005).

**1. Qualified as an Expert—§ 490.065.1**

BSF claims that there is no evidence in the record that would support the fact that Diklich was qualified, as provided in § 490.065.1, to render an expert opinion concerning the danger posed to occupants of the Explorer by the windshield popping out and the roof crushing during an accident due to defective repairs on the windshield. BSF contends that Diklich had to be an engineer to be qualified to render his opinion. Scott contends that Diklich was qualified to render his opinion as to the safety issues in question because he was highly trained and skilled in the repair of vehicles like the Explorer, including the repairs in question here, such that he would necessarily know the dangers posed by the failure to make such repairs in a proper fashion.

▬▬ As to whether a witness is qualified as an expert, § 490.065.1 provides:

In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert *by knowledge, skill, experience, training, or education* may testify thereto in the form of an opinion or otherwise.

(Emphasis added.) The express language of the statute makes it clear that a witness may be qualified as an expert based upon something other than his education or license. *Jones v. Grant,* 75 S.W.3d 858, 863 (Mo.App.2002). To establish that a witness is qualified as an expert to render an opinion in a particular field, the proponent of the witness need only show that: "by reason of specialized experience or education the witness possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or of reaching correct conclusions." *Whitnell,* 129 S.W.3d at 413. Hence, if the witness has some qualifications as to the issue in question, his opinion is admissible. *Id.* The extent of an expert's training or experience does not render his testimony incompetent, but only goes to the weight of his testimony. *Id.*

▮ BSF contends that because Diklich was not an engineer, he was not qualified to render an opinion as to whether the Explorer posed a danger to its occupants because of the defective repairs around the windshield. In so contending, BSF is necessarily contending that Diklich did not have superior knowledge to the jury as to whether the defective repairs in question posed a danger to the occupants of the Explorer due to the windshield popping out or the roof crushing during a crash. The evidence as to his education, training, experience, and skills refute that contention.

As to his qualifications to render an opinion as to whether the Explorer was unsafe due to the defective repairs made to the area around the windshield, Diklich testified that he graduated in 1966 with a Bachelor of Science degree in Automotive Technology from Kansas State College in Pittsburg, Kansas. After graduating from Kansas State College, he worked for Ford Motor Company at the Claycomo Plant, in Kansas City, Missouri. He worked in various capacities at the plant, including test-driving vehicles and conducting emission and quality-control tests. Regarding his work in quality-control, he supervised the inspectors who monitored the quality of the vehicles as they were being constructed on the assembly lines. The inspectors checked every aspect of the vehicle for problems. He worked at Ford until 1972, when he took a teaching position at Longview College.

At Longview, he taught classes on the theory and application of repairing vehicles. As part of the instruction, the students would perform actual repairs on vehicles. He recently retired from teaching full-time, but still teaches approximately 40% of the time. In addition to teaching at Longview College, Diklich wrote a curriculum and developed a two-year vocational program to provide for specific training in the area of bodywork on vehicles. He had also evaluated other collision repair programs and sat on the advisory committees at other schools, developing standards for their programs.

Beginning in the late 1970s, Diklich began doing consulting work for insurance companies, attorneys, and governmental agencies in cases involving automotive vehicles. From 1978 to 1982, he held a Missouri Wholesale and Retail Dealer's license, which allowed him to buy and sell vehicles. He also worked in different dealerships as an Extended Service Contract

Inspector, inspecting vehicles to verify that the damage was covered by the service contract and would discuss needed repairs with the customer. Beginning in 1982, and covering a ten-year span, he performed 3,500 such inspections. After he left his job as an inspector, he taught in a General Motors' training program for eight years, training technicians in all automotive fields. After he left GM, he taught a similar program at Toyota.

As noted, *supra*, the ultimate test for qualifying an expert witness under § 490.065.1 is whether his knowledge of the issue in question is superior to that of an ordinary juror and whether his testimony would aid the jury in deciding the issue on which he testified, *Thomas v. Festival Foods*, 202 S.W.3d 625, 627 (Mo.App.2006), which here was whether the defective repairs to the area around the windshield rendered the Explorer unsafe due to the likelihood of the windshield popping out or the roof crushing during a crash. Inasmuch as Diklich had almost forty years of experience in repairing motor vehicles, supervising quality-control inspectors who inspected all aspects of vehicles, teaching automotive repair classes, and inspecting vehicles, it begs the question to suggest, as BSF does in this point, that Diklich would not have superior knowledge as to the dangers posed to occupants of the Explorer by the defective repairs made around the windshield. Hence, the fact that Diklich was not an engineer does not disqualify him from rendering an expert opinion as to that issue. The fact that Diklich was not an engineer would go only to the weight of his testimony and not to his qualifications to render an expert opinion as to that issue. *Whitnell*, 129 S.W.3d at 413.

## 2. Facts and Data Relied Upon—§ 490.065.3

BSF also claims that the trial court erred in admitting Diklich's challenged expert testimony for failure to lay a proper foundation, in accordance with § 490.065, because Scott failed to establish, as required by § 490.065.3, that, in rendering his opinion, Diklich was relying on facts and data of a type reasonably relied upon by experts in the field. Specifically, BSF claims that to lay a proper foundation for the admission of Diklich's challenged expert testimony, satisfying § 490.065.3, there had to be evidence that he performed crashworthy testing on Scott's vehicle to obtain what BSF contends were necessary facts and data in rendering his opinion as to the safety concerns he had as to the Explorer due to the defective repairs made around the windshield.

Section 490.065.3 provides:

The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

In interpreting § 490.065.3 in *State Bd. of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 156 (Mo. banc 2003), the Missouri Supreme Court stated: *"[S]ection 490.065.3 expressly requires a showing that the facts and data are of a type reasonably relied on by experts in the field in forming opinions or inferences upon the subject of the expert's testimony. The court must also independently assess their reliability."* However, the requisite facts and data for the expert's opinion may be those either perceived by the expert or made known to him. § 490.065.3. In other words, an expert may base his opinion on facts and data derived from sources outside of court and other than by his own

perceptions. *Wulfing v. Kan. City S. Indus., Inc.*, 842 S.W.2d 133, 151 (Mo.App. 1992). Here, Diklich's challenged opinion relied on facts and data that he "perceived" by inspecting the vehicle on three separate occasions. BSF contends that such inspections were not sufficient to obtain the requisite facts and data necessary for Diklich's opinion testimony. Rather, it claims that the requisite facts and data could not be obtained without doing crashworthy testing, which he admittedly did not do.

With respect to determining whether the foundation of § 490.065.3 is satisfied in admitting the challenged expert opinion evidence, the trial court has two mandates: (1) to "determine whether the facts and data are reasonably relied upon by experts in the particular field"; and (2) to "ensure that the facts and data are otherwise reasonably reliable." *Goddard v. State*, 144 S.W.3d 848, 854 (Mo. App.2004). In other words, the test of § 490.065.3 is a two-fold reliability test: Are the facts and data, "as tested by professional acceptance standards in the field [ ] reasonably reliable, and [are they] otherwise reasonably reliable as a matter of general evidentiary principle." *Wulfing*, 842 S.W.2d at 152. As a general rule, questions concerning the first test of reliability, the "sources and bases of the expert's opinion[,] affect the weight, rather than the admissibility, of the opinion, and are properly left to the jury." *Id.* It is only "when the source upon which the expert relies for [his] opinion is so slight as to be fundamentally unsupported, [that] the jury may not receive the opinion." *Id.* In other words, questions surrounding the expert's sources for his opinion affect the weight, rather than the admissibility, of the opinion, and are properly left to the jury. Thus, "[a]lthough a trial court has the independent responsibility to decide if the foundational facts meet the minimum

standards of reliability as a condition of the admissibility of the opinion, ... [i]t is only in those cases where the source upon which the expert relies for opinion is so slight as to be fundamentally unsupported, that the [jury] may not receive the opinion." *Keyser v. Keyser*, 81 S.W.3d 164, 169 (Mo.App.2002).

The record reflects that Diklich, in rendering his expert opinion at trial, admitted that he did not perform any crashworthy tests on Scott's Explorer. However, the record also reflects that he inspected the vehicle on three separate occasions. During the first inspection, on October 21, 1999, Diklich testified that he spent the first ten to fifteen minutes visually inspecting the outside of Scott's Explorer for signs of repairs. He then spent another forty-five minutes following up on his visual inspection by examining the vehicle in closer detail, taking measurements and photographs. Diklich then conducted a second inspection on November 28, 2001. During that inspection, he conducted more of a structural inspection in which he removed the interior of the vehicle so he could inspect the repair work from the inside out. Finally, because he felt that some of the work he had done in the second inspection was not as thorough as possible, he conducted a third follow-up inspection. Diklich testified that from these inspections, he was able to identify rust and corrosion around the windshield installation and adhesion areas. He testified that the area was so rusted and corroded that he believed that if the vehicle was involved in an accident, in which it rolled over, the windshield was likely to pop out. From his inspections, he was also able to observe that the welds in the rocker panel area had corroded away and the exterior skin was not adhering well to the rocker. He testified that it was so corroded that it was questionable whether

the vehicle would hold together during a rollover. The facts and data disclosed by Diklich's inspections would have been sufficient to allow someone with his expertise, as discussed, *supra*, to draw the conclusion that the Explorer was unsafe due to the defective repairs made around the windshield. As such, we cannot say that Diklich, in rendering his opinion, relied on data and facts so slight that his opinions were fundamentally unsupported, and, therefore, we cannot say that the trial court abused its discretion in allowing Diklich's expert opinions over the objections of BSF.

## B. Degree of Engineering Certainty

In Point II, BSF also claims that the trial court erred in allowing, over its objection, Diklich to testify as to his opinion regarding safety concerns with the Explorer due to defective repairs because he did not state, as required, that his opinion was rendered "within a reasonable degree of certainty." Specifically, BSF claims that Diklich's challenged opinion testimony was inadmissible because in testifying, he equivocated, using speculative terms such as "could" and "I don't think." In that regard, he testified, during direct examination:

> Q: You reached a conclusion that the nature of the repairs that were done in this area of the windshield left a defect that *could* effect [sic] safety?
>
> A: Yes, from a repair standpoint ... [b]ut from the repair standpoint it's well-known in our field that windshield retention is a problematic area when you go to do it.
>
> . . .
>
> Q: Okay. And this vehicle was not repaired that way?

> A: No. The windshield adhesion *I don't think* was going to be any good in that upper left hand corner[.]

(Emphasis added.)

 BSF is correct in asserting that Diklich, in testifying as to his safety concerns with the windshield repairs to the Explorer, was required to testify to a "reasonable degree of certainty." *Mast v. Surgical Servs. of Sedalia, L.L.C.*, 107 S.W.3d 360, 373 (Mo.App.2003). The general rule is: "When a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty." *Id.* (citation omitted). "Although it may be arguable as to whether the exact phraseology of 'reasonable degree of certainty' is necessary, language that is equivocal will not rise to the level necessary for consideration of the evidence by the trier of fact." *Abbott v. Haga*, 77 S.W.3d 728, 732 (Mo.App.2002). "When an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Mast*, 107 S.W.3d at 373 (citation omitted). It is well established that "it is not improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper." *Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 447 (Mo. *banc* 1998) (internal quotation marks and citations omitted).

 Given the applicable law in this area, the mere fact that Scott asked Diklich whether the repairs *could* affect safety does not mean that his subsequent answer was not stated within a reasonable degree of certainty. In addition, the mere fact that Diklich answered the second question by stating that "*I don't think*" does not

mean that his answer was speculative or equivocal. Rather, it is clear from the record that he did not think that, due to the repairs, the windshield would adhere to the pillars in the upper left-hand corner. Furthermore, after reviewing the entirety of Diklich's testimony, it is obvious to us that Diklich was unequivocal in his belief that the repairs done to Scott's Explorer were defective. As such, the trial court did not err in admitting the testimony on the basis claimed in this point.

Point denied.

### III.

In Point III, BSF claims that the trial court erred in overruling its motion for a new trial, alleging, *inter alia,* that the jury had awarded Scott excessive compensatory damages on Counts I, II, and VIII, or, in the alternative, denying its request, pursuant to § 537.068, to remit the award as being excessive, because the award was not supported by the record, but was engendered by the bias, passion, and prejudice of the jury, caused by the trial court's admission of evidence of alleged similar occurrences of sales of wrecked vehicles by BSN and Wholesale. We disagree.

The jury, having found in favor of Scott and against BSF on Counts I, II, and VIII, assessed compensatory damages, in lump sum, of $25,500. In accordance with the trial court's instructions, the jury did not designate a separate amount for each count. It simply awarded lump sum compensatory damages of $25,500, which, on appeal, BSF claims is excessive.

The jury was instructed, *inter alia,* on Counts I, II, and VIII of Scott's claims against BSF. In Count I, Scott sought compensatory damages for common law fraud; in Count II, he sought compensatory damages for fraud, pursuant to § 407.025.1 of the MMPA; in Count VIII, he sought compensatory damages for breach of express and implied warranties of §§ 400.2–313 and 400.2–314(2)(a), pursuant to 15 U.S.C. § 2310(d) of the MMWA. As to Counts I, II, and VIII, the jury was instructed in one instruction, Instruction No. 6, on the issue of compensatory damages. Instruction No. 6 reads:

> If you find in favor of plaintiff against defendant Blue Springs Ford Sales, Inc., or defendant Robert Balderston, then you must award plaintiff such sum as you believe was the difference between the actual value of the Ford Explorer on the date it was sold to the plaintiff and what its value would have been on that date had the vehicle been as represented by defendant Blue Springs Ford Sales, Inc., plus such sum as you believe will fairly and justly compensate plaintiff for any other damages plaintiff sustained as a direct result of the occurrence submitted in the evidence.

The instruction was patterned after a modified version of MAI 4.03 [1969 New], the mandatory instruction for submitting compensatory damages for misrepresentation, and MAI 4.01 [2002 Revision], and "modeled on damages instruction given by the court in *Grabinski v. Blue Springs Ford Sales, Inc.*" Although Instruction No. 6 purports to instruct on compensatory damages for breach of warranty, Count VIII, as well as compensatory damages for common law fraud, Count I, and for misrepresentation under the MMPA, Count II, it does not reference MAI 4.17 [1980 New], the mandatory instruction for submitting compensatory damages for breach of warranty. However, Instruction No. 6 does include language found in MAI 4.17.

MAI 4.03 reads:

> If you find in favor of the plaintiff, then you must award plaintiff such sum as you believe was the difference between the actual value of the (*describe property, such as "the furnace"*) on the date it

was sold to plaintiff and what its value would have been on that date had (*describe property* ) been as represented by defendant.

MAI 4.17 reads:

> If you find in favor of plaintiff, then you must award plaintiff such sum as you believe was the difference between the fair market value of (*describe the article or product* ) when plaintiff discovered or should have discovered [it did not conform] [it was unfit] and its fair market value had it been as represented by defendant [plus such sum as you believe will fairly and justly compensate plaintiff for any other damage plaintiff sustained as a direct result of (*describe the article or product* ) [failing to conform] [being unfit].]

Hence, Instruction No. 6 essentially appears, albeit apparently unintentionally, to combine the two instructions.

 "Excessive verdicts generally arise in two situations: (1) when the jury makes an honest mistake in weighing the evidence as to the nature and extent of the injury and awarding disproportionate damages; and (2) when the jury is biased by trial misconduct to award grossly excessive damages." *McCormack v. Capital Elec. Constr. Co.*, 159 S.W.3d 387, 394–95 (Mo. App.2004). In the first instance, remittitur is appropriate without re-trial, while in the second instance, a new trial is appropriate. *Id.* at 395. The rationale for this dichotomy has been stated thusly:

> [W]here the jury errs by awarding a verdict which is simply too bounteous under the evidence, injustice may be prevented by ordering a remittitur. A new trial is not required because the jury is not guilty of misconduct, only an honest mistake as to the nature and extent of the injuries.

*Lindquist v. Scott Radiological Group, Inc.*, 168 S.W.3d 635, 647 (Mo.App.2005)

(*quoting Larabee v. Washington*, 793 S.W.2d 357, 360 (Mo.App.1990)).

Although BSF claims, alternatively, in its Point Relied On in this point, that the jury's award of compensatory damages was grossly excessive, mandating a new trial, and if not grossly excessive, it was merely excessive, mandating remittitur, its argument does not assert any trial error or misconduct, as required in claiming grossly excessive compensatory damages. As such, its claim as to "grossly excessive" damages in this point would fail. However, as noted, *supra*, in Point I, BSF does claim trial error, which it contends prejudiced it in that it resulted in an excessive award of both *compensatory* damages and *punitive* damages. In that regard, BSF claims, in Point I, that the trial court erred in admitting, over its objection, evidence of alleged similar occurrences of sales of wrecked vehicles to show, among other things, a fraudulent intent in the sale of the Explorer to Scott because it was not admissible against BSF in that the sales were conducted by separate legal entities, BSN and Wholesale, not BSF. Hence, cobbling together BSF's claim in Point I and its claim in this point, we will treat the issue of grossly excessive damages as being raised. BSF also claims in this point, in the alternative, that even if the award of compensatory damages to Scott as to Counts I, II, and VIII was not grossly excessive, based on the erroneous admission of the challenged evidence, the trial court erred in awarding Scott $25,500 in compensatory damages, because it was excessive. We will deal with BSF's alternative claims in turn.

### A. Grossly Excessive Compensatory Damages

 At trial, Scott sought, *inter alia*, to introduce evidence that BSF had, on multiple occasions, sold vehicles to custom-

ers without disclosing that they had been wrecked and repaired. He sought to introduce this evidence to show, *inter alia*, that the fraudulent misrepresentations made by BSF were not made by accident, but were made with the intent to deceive him. Such evidence is admissible in fraud cases to show the absence of mistake. *Brockman v. Regency Fin. Corp.*, 124 S.W.3d 43, 50–51 (Mo.App.2004). However, in addition to introducing evidence of such sales by BSF, Scott also introduced evidence of such sales by BSN and Wholesale, which were owned by Balderston. BSF objected to the admission of this evidence on the basis that there was no legal nexis between it and BSN and Wholesale such that their actions could not be imputed to it in determining compensatory damages. The trial court allowed the evidence.

 To be entitled to a new trial, based on a grossly excessive verdict for damages, actual trial error must be shown. *Barnett v. La Societe Anonyme Turbomeca Fr.*, 963 S.W.2d 639, 657 (Mo.App.1997). The size of the verdict alone will not establish the requisite bias, passion, and prejudice of the jury sufficient to order a new trial for an excessive verdict. *Id.* The party challenging the verdict as being excessive must show that the verdict, viewed in a light most favorable to the plaintiff, "was glaringly unwarranted and that some trial error or misconduct of the prevailing party was responsible for prejudicing the jury." *Id.*

██ Even assuming, *arguendo*, that BSF is correct that the trial court erred in allowing the challenged evidence, its claim in this point still must fail, in that to succeed on its claim, it has to show not only that the evidence in question was erroneously admitted, but that it *caused* the jury to assess grossly excessive compensatory damages. Given the nature of

the challenged evidence, we fail to see how its admission had any bearing on the issue of compensatory damages for misrepresentation or breach of warranty. As noted, *supra*, the jury was instructed on compensatory damages in Instruction No. 6 on all three counts, Counts I, II, and VIII. There is nothing in that instruction that would have allowed the jury to use the challenged evidence as a basis for increasing its award of compensatory damages. Hence, BSF fails to make a claim for "grossly excessive" compensatory damages.

## B. Merely Excessive Compensatory Damages

BSF claims in this point, in the alternative, that even if we find that Scott was not awarded grossly excessive compensatory damages, the trial court erred in denying its request, pursuant to § 537.068, to remit the award as being merely excessive, because the award was not supported by the record, but was engendered by the bias, passion, and prejudice of the jury caused by the trial court's admission of evidence of alleged similar occurrences of sales of wrecked vehicles by BSN and Wholesale. We disagree.

██ The assessment of damages is primarily a function for the jury. *Ince v. Money's Bldg. & Dev., Inc.*, 135 S.W.3d 475, 478 (Mo.App.2004). However, pursuant to § 537.068, "[a] court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." Remittitur, pursuant to § 537.068, is appropriate without re-trial, "where the jury errs by awarding a verdict which is simply too bounteous under the evidence," and has simply made "an honest mistake as to

the nature and extent of the injuries." *Lindquist*, 168 S.W.3d at 647.

 This court reviews the trial court's failure to order remittitur solely for an abuse of discretion. *Lavin v. Carroll*, 871 S.W.2d 465, 468 (Mo.App.1994). An abuse of discretion occurs when a verdict is so excessive as to shock the conscience of the appellate court. *McCormack*, 159 S.W.3d at 395. In determining whether a verdict is excessive, requiring remittitur, this court reviews the evidence in the light most favorable to the verdict. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 250 (Mo. *banc* 2001). "Each case must be considered on its own facts with the ultimate test being what fairly and reasonably compensates plaintiff for the damages sustained." *Ince*, 135 S.W.3d at 479.

As noted, *supra*, the jury found in favor of Scott and against BSF on Counts I, II, and VIII. With respect to compensatory damages as to all three counts, the jury was instructed in Instruction No. 6, set out, *supra*. In other words, the jury was instructed that the measure of compensatory damages as to all three counts was identical. Likewise, in returning its verdict, with respect to the issue of compensatory damages, as to those same counts, the jury was instructed such that it could only return one damage figure. In other words, it was not asked to assign a separate compensatory damage figure for each count on which it found for the plaintiff, Scott. Hence, given the fact that the jury was instructed on the same measure of compensatory damages in Instruction No. 6, in returning its verdicts for Scott on Counts I, II and VIII and assessing damages thereon of $25,500, the jury necessarily found that Scott's compensatory damages, as to each count, were $25,500. Despite that fact, of course, due to the doctrine of merger, he was only entitled to damages in the total amount of $25,500,

not three times that amount. Under the merger doctrine, Scott is entitled to be made whole by one compensatory damage award, but not to the windfall of three recoveries. *Vogt v. Hayes*, 54 S.W.3d 207, 211 (Mo.App.2001). Hence, in deciding the issue presented, whether the record, minus the challenged evidence, supported the jury's award of compensatory damages, it is sufficient, in affirming the trial court's compensatory damage award of $25,500, to find that the award was supported by the permissible record as to any one of the three counts on which the jury found for Scott.

 After reviewing the record, we have determined that the highest award of compensatory damages that the record would support is an award of $24,367, on Count I, for common law fraud. In that regard, an alleged fraud victim has two choices as to remedies: (1) he can rescind the contract and seek restitution; or (2) he can keep what he purchased and sue for the benefit of the bargain, which is calculated as "the difference between the value as represented and the true value as of the date of purchase." *Id.; see also Sunset Pools of St. Louis, Inc., v. Schaefer*, 869 S.W.2d 883, 886 (Mo.App.1994). Here, Scott sought damages based on the benefit of the bargain, as submitted in Instruction No. 6. In seeking the benefit of the bargain, Scott also sought consequential damages—damages which are "the direct and natural consequence of [the plaintiff] acting on the faith of defendant's representations[,]" which are allowed in cases of misrepresentation. *Davis v. Cleary Bldg. Corp.*, 143 S.W.3d 659, 668 (Mo.App.2004); *Hanes v. Twin Gable Farm, Inc.*, 714 S.W.2d 667, 670–671 (Mo.App.1986). Instruction No. 6 instructs on such damages *via* the language: "plus such sum as you believe will fairly and justly compensate plaintiff for any other damages plaintiff

sustained as a direct result of the occurrence submitted in the evidence."

■ BSF claims that the record, excluding the evidence of the five vehicles sold by BSN and Wholesale, would only support a compensatory damage award, as to Count I, of $8,500. In claiming as it does, it points to the testimony of Scott's expert, Diklich, who testified, in pertinent part, that the value of the vehicle as represented was $15,500, and the actual value, on the date of purchase, was $7,000 ($15,500 − 7,000 = $8,500). In claiming that the record would only support a compensatory damage award, as to Count I, of $8,500, based on the testimony of Diklich, BSF is not only ignoring the fact that the jury was instructed on consequential damages, which are supported on the record, but is also ignoring our standard of review. In reviewing the award of compensatory damages to Scott on Count I, for common law fraud, we are to view the evidence in a light most favorable to the verdict. *Knifong v. Caterpillar, Inc.*, 199 S.W.3d 922, 927 (Mo.App.2006). Hence, the fact that there is contrary evidence in the record that would support a different award of compensatory damages on Count I, specifically Diklich's testimony, is irrelevant. The question is whether the record, excluding the challenged evidence, when viewed in a light most favorable to the trial court's award, supports the jury's award of compensatory damages.

■ As to the actual value of the Explorer at the time of purchase, Scott testified that it had no value. He based his valuation on the fact he could not reasonably expect to sell it, due to its unsafe condition, resulting from the defective repairs of the damage to the Explorer from being wrecked. As the owner of the Explorer, Scott was qualified to give an estimate of its fair market value, *DeLong v. Hilltop Lincoln–Mercury, Inc.*, 812 S.W.2d

834, 841 (Mo.App.1991), which the jury was free to believe, rejecting Diklich's testimony that the vehicle at the time of purchase was valued at $7,000, *id.* at 842. Thus, Scott's testimony was sufficient, alone, to support an award of compensatory damages of at least $15,500.

■ As to an award for consequential damages:

> The general rule, in cases of fraud or deceit, is that defendant is responsible for those results, injurious to plaintiff, which must be presumed to have been within his contemplation at the time of the commission of the fraud, and plaintiff may recover damages for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations.

*Hanes*, 714 S.W.2d at 670. In that regard, Scott testified that he incurred finance charges of $7,199. He also testified that he incurred additional expenses of $1,633 for credit life insurance and $35 for an "origination fee." He contends that these three additional expenses, totaling $8,867, stemmed directly and naturally from BSF's misrepresentation as to the Explorer and, thus, could properly be included in the jury's compensatory damage award. If they were properly included, the record would support an award of compensatory damages of $24,367 on Count I.

BSF contends that Scott was not entitled to any award for consequential damages sustained by him in financing the Explorer because, even with the alleged misrepresentation, he would still have to have financed the Explorer. In the alternative, BSF contends that even if Scott's financing expenses could have been included in the jury's award of compensatory damages as consequential damages, they would have to have been prorated since, regardless of the misrepresentation, he

would have still incurred some percentage of those expenses even if he had purchased the Explorer for its actual value, $7,000. In so contending, BSF is assuming that the vehicle had an actual value of $7,000, the amount to which Diklich testified as being the actual value of the Explorer, at the time of purchase. However, as noted, *supra*, viewing the record in a light most favorable to the jury's verdict, as we are required to do, *Knifong*, 199 S.W.3d at 927, the jury was free to believe that the Explorer did not have an actual value of $7,000 and, as such, the jury could have reasonably concluded that Scott would have incurred no additional expense in purchasing it. Hence, including an amount for consequential damages, the record would support a compensatory damage award to Scott on Count I of $24,367.

Scott attempts to justify the remaining $1,133 of the compensatory award ($25,-500–24,367) by contending that the jury was justified in awarding him damages for "embarrassment" and "inconvenience." However, Scott cites no authority, and we find none, for the proposition that in a fraud case, the defrauded party can be compensated for his "embarrassment" and "inconvenience." Hence, the record only supports a compensatory damage award of $24,367, such that the award of $25,500 is excessive by $1,133, such that the trial court erred in failing to grant BSF's request to remit a portion of the award.

On appeal, the court, pursuant to § 537.068, can order a remittitur for excessive damages. However, it cannot compel it. *Ince*, 135 S.W.3d at 481. Rather, it can only order the plaintiff to remit the amount deemed appropriate or "experience the burden and expense of a new trial." *Id.* "In other words, a plaintiff has the option of agreeing to the remittitur or facing a new trial." *Id.* Hence, having

found that the award of compensatory damages to Scott, in the amount of $25,500, was excessive, as not being supported by the evidence, in the amount of $1,133, if Scott enters remittitur in that amount, within fifteen days after the filing of this court's mandate herein, the trial court's judgment as to compensatory damages on Count I will stand affirmed at $24,367. However, if he does not, then the court's judgment for compensatory damages of $25,500 will be reversed for a new trial on the issue of damages.

## IV.

In Point IV, BSF attacks the trial court's award of punitive damages to Scott of $840,000 on Count I for misrepresentation under the MMPA, as being excessive. We decline to review based on the Supreme Court's holding and order of remand in *Scott*, 176 S.W.3d at 143.

As discussed, *supra*, in *Scott*, 176 S.W.3d at 143, the Missouri Supreme Court found that the trial court erred in preventing the jury from deciding the issue of punitive damages as to Scott's MMPA claim in Count II. The Court ordered that Scott's case be remanded to the trial court for a determination by the jury of that issue. *Id.* It further ordered that: "Once there is a jury finding as to the proper amount of punitive damages for each claim, the trial court can determine the extent to which the awards merge and whether the amount of the award is in accordance with *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and enter judgment accordingly." *Id.* Hence, the claim in this point is inextricably intertwined with the issue on the remand of the Supreme Court in *Scott*, *supra*, such that any review of the issue raised in this point must wait for the issue of punitive damages to play out in accordance with the remand of the Court in *Scott*, *supra*.

## V.

In Point V, BSF claims that the trial court erred in overruling its motion for directed verdict at the close of the evidence and its motion for JNOV, with respect to Scott's breach of warranty claim, Count VIII, because Scott failed to carry his burden of showing that BSF, after being given a reasonable opportunity to do so, failed to cure the alleged defect. We disagree.

Our standard of review as to the denial of a motion for JNOV is essentially the same as that for the denial of a motion for a directed verdict. *Cohen v. Express Fin. Servs., Inc.*, 145 S.W.3d 857, 865 (Mo.App.2004). We will affirm the trial court's denial of a motion for JNOV as long as the plaintiff made a submissible case. *Id.* In reviewing for a submissible case, we view the evidence in the light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable inferences that can be drawn from the evidence, while disregarding all unfavorable evidence and inferences. *Id.* To make a submissible case, the plaintiff must present substantial evidence establishing each and every element of his claim. *Payne v. City of St. Joseph*, 135 S.W.3d 444, 450 (Mo.App.2004). Substantial evidence is competent evidence from which the trier of fact can reasonably decide the case. *Id.*

Under the MMWA, "[n]o action ... may be brought under subsection (d) of this section for failure to comply with any obligation under any written or implied warranty or service contract ... unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure such failure to comply." 15 U.S.C. § 2310(e). Thus, in order to make a submissible case of breach of warranty under the MMWA, the plaintiff must show that, prior to filing the lawsuit, he provided the defendant with a reasonable opportunity to cure the alleged breach of warranty and defendant refused to cure it. *Radford v. Daimler Chrysler Corp.*, 168 F.Supp.2d 751, 753 (N.D.Ohio 2001). However, if the defendant knew of the defect at the time of sale, then the plaintiff is relieved of showing that the defendant was given an opportunity to cure the defect and failed to do so. *Id.* at 753–54; *Alberti v. Gen. Motors Corp.*, 600 F.Supp. 1026, 1028 n. 2 (D.D.C.1985); *McFadden v. Dryvit Sys., Inc.*, 2004 WL 2278542 *17 (D.Or.).

Here, there is evidence in the record, which if believed, would lead the jury to believe that BSF knew of the defect as to the Explorer when it sold it to Scott, relieving him of his obligation, under 15 U.S.C. § 2310(e), to show that BSF had an opportunity to cure the defect and failed to do so. In that regard, Diklich testified that it would have been obvious to a used-car salesman, at the time Scott's Explorer was sold in 1994, that it had been previously wrecked. Diklich testified that within fifteen minutes of his first inspection, he noticed that the front bumper did not coordinate to the vehicle, which was a clear indication that the Explorer had been in an accident. He also noticed that the quarter-panels in the roof and the right fender had been replaced. Diklich testified that just by looking at the Explorer he could see paint sags and mask lines, so it was obvious to him and should have been obvious to others in the business of selling used vehicles, that sections of the Explorer had been repainted. He used an electronic gauge to measure the thickness of the paint, which confirmed his theory that parts of it had been repainted. Diklich testified that it should have been obvious to any used-car salesperson that Scott's Explorer had been repainted. He testified that once a used-car salesperson figured out that the Explorer had been repainted,

it would not take very long to figure out that it had been previously wrecked. During Diklich's second inspection, he performed a more detailed structural inspection. He testified that he put the vehicle on a lift and saw that parts on the vehicle had department parts stickers, which come on all replacement parts. Diklich testified that anybody in the automotive industry would recognize those stickers. Diklich also noticed that the Explorer was missing a splash shield fastener and a grill bolt, which are consistent with repair work. A speedometer cable was also out of its clip, which is also consistent with repair work. Hence, there was substantial evidence in the record, which if believed, would lead the jury to believe that BSF knew of the defect as to the Explorer when it sold it to Scott. As a consequence, Scott, in order to make a submissible case for breach of warranty on Count VIII, was relieved of his obligation, under 15 U.S.C. § 2310(e), to show that BSF had an opportunity to cure the alleged defect in the Explorer and failed to do so.

Point denied.

### Conclusion

As to Scott's appeal, the judgment of the Circuit Court of Jackson County is affirmed, except with respect to Point I, which was decided by the Missouri Supreme Court in *Scott,* 176 S.W.3d at 143. As to BSF's cross-appeal, the circuit court's judgment is affirmed except as to its award of compensatory damages of $25,500, and its award of punitive damages, on Count I, of $840,000. With respect to the court's award of compensatory damages, if within fifteen days of the filing of our mandate in this case, Scott enters a remittitur of $1,133, for a total compensatory damage award of $24,367 for Counts I, II, and VIII, then the court's judgment as to compensatory damages will be affirmed in that amount; if not, the judgment will be reversed as to that issue, and the case remanded for a new trial on this issue of damages alone. *See Letz v. Turbomeca Engine Corp.,* 975 S.W.2d 155, 180 (Mo.App.1997). With respect to the court's award of punitive damages of $840,000 on Count I, Scott's breach of warranty claim under the MMWA, because the issue of punitive damages as to Count II, Scott's misrepresentation claim under the MMPA, was remanded with directives by the Missouri Supreme Court in *Scott, supra,* and the two issues are inextricably intertwined, due to the merger doctrine and the Court's directives on remand, we decline presently the review of the issue of whether the punitive damage award of $840,000 on Count I was excessive, pending the outcome on remand of the punitive damage issue as to Count II.

NEWTON and HOLLIGER, JJ., concur.